# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-02133-SCT

*CHARLES B. BENVENUTTI, AS CONSERVATOR*
*OF THE ESTATE OF SOON SAN PAK, AND*
*JULIE SMITH AND JACKIE SMITH,*
*INDVIDUALLY AND AS CONSERVATORS OF*
*THE PERSON OF SOON SAN PAK*

*v.*

*JOHN MCADAMS, IN HIS OFFICIAL CAPACITY*
*AS CHANCERY CLERK OF HARRISON COUNTY,*
*MISSISSIPPI AND HARRISON COUNTY,*
*MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/16/2013 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| TRIAL COURT ATTORNEYS: | MARCIE FYKE BARIA |
| | DAVID W. BARIA |
| | TIMOTHY C. HOLLEMAN |
| | PATRICK T. GUILD |
| | DONALD C. DORNAN, JR. |
| | LAUREN HILLERY |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID WAYNE BARIA |
| | MARCIE FYKE BARIA |
| ATTORNEYS FOR APPELLEES: | DONALD C. DORNAN, JR. |
| | LAUREN RUTH HILLERY |
| | TIM C. HOLLEMAN |
| | PATRICK T. GUILD |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 05/07/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., PIERCE AND KING, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The conservators of Soon San Pak's estate filed suit against their two attorneys, Harrison County, the Harrison County Chancery Clerk, John McAdams, and the guardian *ad litem* appointed for Mrs. Pak, after the previously appointed conservator, Woodrow W. Pringle III, embezzled money from the estate. The claims were dismissed upon a finding by the circuit court that the applicable statutes of limitation had lapsed. The conservators appealed. McAdams cross-appealed, asserting that the trial court improperly held that the conservators asserted a Section 1983 claim by implication against him and that Pringle was a state actor for whom McAdams and Harrison County could be vicariously liable. Because the statute-of-limitation issue is dispositive, this Court will not address McAdams's cross-appeal.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶2.     In approximately 2001, Mrs. Soon San Pak underwent numerous surgeries after the discovery of a tumor on her pituitary gland. In 2002, Mrs. Pak's daughters, Julie and Jackie Smith, were informed that Mrs. Pak was no longer able to manage her estate. The daughters sought to establish a conservatorship but abandoned their pursuit after reaching an agreement with their stepfather, Yong Pak, regarding the care of their mother.

¶3.     In 2005, Jackie and Julie Smith again sought to establish a conservatorship over their mother, after learning that Yong Pak's son Paul had obtained a cashier's check totaling more than $300,000, from one of Mrs. Pak's accounts.[1] Initially, the Smiths were named co-

---

[1] Julie and Jackie were able to stop the transaction before the funds were distributed.

conservators of their mother's person and estate, but after unsuccessful attempts to secure a bond, Pringle was appointed conservator of Mrs. Pak's estate. The Smiths remained as coconservators of Mrs. Pak's person. Charliene Roemer was appointed guardian *ad litem*. Roemer also was appointed to serve as divorce counsel for Mrs. Pak in divorce proceedings against Yong Pak.[2]

¶4.     On July 31, 2007, the Smiths, through one of their attorneys, Jane Meynardie, filed a motion with the chancery court, expressing concerns about Pringle's administration of their mother's estate. On the same day, the Smiths filed an accounting.

¶5.     On January 23 and 24, 2008, the chancery court heard arguments on the following motions filed by Julie and Jackie Smith, as co-conservators of Mrs. Pak: Motion to Approve Supplemental Inventory filed May 10, 2006; Motion to Approve Final Accounting, *inter alia*, filed July 31, 2007; and Motion to Show Cause, *inter alia*, filed January 2, 2008.[3] During the hearing, Jane Meynardie informed the court that the only accounting that had been filed was the one filed by the Smiths. The chancellor approved and accepted the final accounting of the co-conservators but did not order that Pringle provide an accounting.

¶6.     On September 29, 2010, Pringle filed his first accounting with the court, showing that Mrs. Pak's Peoples Bank account had $277,082.58.[4] However, at the time of the accounting, the account had only $86. On December 14, 2010, Pringle committed suicide. Although

[2] As of the October 3, 2013, hearing, the Paks were not divorced.

[3] These motions are not part of the record.

[4] The beginning balance was $337,383.26.

3

aware of Pringle's maladministration of their mother's estate, the Smiths determined the vastness of Pringle's misdeeds had cost approximately $400,000 from Mrs. Pak's estate.[5]

¶7.    On June 29, 2012, Charles Benvenutti, as conservator of the estate of Soon San Pak, and Julie Smith and Jackie Smith, individually and as conservators of the person of Soon San Pak ("Conservators"), filed a complaint against Harrison County, Mississippi, Jane Meynardie, Clare Hornsby, Charliene Roemer, and John McAdams, after discovering that approximately $400,000 had been misappropriated or converted from the estate of Soon San Pak by Pringle.[6] The Conservators alleged actions for deprivation of civil rights (42 U.S.C. § 1983) against Harrison County; breach of statutory duties and liability on bond as to John McAdams; legal malpractice, breach of contract, breach of fiduciary duty, and negligent infliction of emotional distress by Jane Meynardie, Clare Hornsby, and Charliene Roemer.[7]

---

[5] Based on an August 8, 2011, Report from Stephanie Halphen-McKay, appointed to perform a forensic analysis on Pringle's conservatorships, the Pak conservatorship had total income of $484,715 and total expenses of $484,628. Checks were written to Pringle, with $241,000 deposited into Pringle's Trust Account, $51,726 deposited into Pringle's operating account, and $17,000 in checks cashed and/or paid directly to American Express.

[6] Suits originally were filed against all but McAdams on March 29, 2011, and against Harrison County for Mississippi Tort Claims Act (MTCA) claims on October 3, 2011. The complaints were dismissed without prejudice on July 2, 2012, due to the failure of the Conservators to request leave from the court to file suit.

[7] On April 16, 2013, the Conservators agreed to dismiss all claims against Jane Meynardie and Charliene Romer with prejudice. While all parties state in their briefs that Clare Hornsby also was dismissed from this suit, the order of dismissal is not in the record before this Court. These three attorneys are not part of this appeal.

Additionally, on the same day, the Conservators filed a separate complaint, alleging Mississippi Tort Claims Act violations against Harrison County.[8]

¶8.     The Conservators' June 2012 Complaint made the following allegations:

> ¶ 32.   *For several years*, plaintiffs JULIE SMITH and JACKIE SMITH complained to both their counsel, defendants JANE MEYNARDIE and CLARE HORNSBY, and to the guardian ad litem/divorce counsel for their mother, defendant CHARLIENE ROEMER, *about Mr. Pringle's perceived maladministration of the Estate of Soon San Pak*. These complaints included, but were not limited to, that they believed that Mr. Pringle was *embezzling funds from their mother's Estate*; that Mr. Pringle *had not filed a single accounting*; that Mr. Pringle *had not filed estate taxes*; that Ms. Pak's social security benefits were being garnished for failure to file taxes; that Mr. Pringle refused to repair their mother's residence, failed to provide for Ms. Pak's needs, and generally left Ms. Pak living in squalor despite the fact that there were adequate funds to provide for her care; and that Mr. Pringle and his staff were openly hostile to plaintiffs JULIE SMITH and JACKIE SMITH when they sought to deal with issues on their mother's behalf.

> ¶ 33.   Defendants JANE MEYNARDIE, CLARE HORNSBY, and CHARLIENE ROEMER did not take any action to investigate and/or remedy the issues brought to their attention by discovering the gross mishandling of the estate, the gross failures of the county, or ignoring same and by failure to pursue other potentially liable parties, including but not limited to the banking institutions involved. They simply did not act despite repeated urging and pleading by plaintiffs JULIE SMITH and JACKIE SMITH over the course of several years. . . .

¶9.     Harrison County filed a motion to dismiss the civil rights claim against it based on the running of the applicable statute of limitations. Harrison County claimed the Conservators had three years to file the action from the time they knew or should have known of Harrison County's tortious conduct. *See* Miss. Code Ann. ¶ 15-1-49 (Rev. 2012). Harrison County argued that, at the latest, the Conservators should have known about the misconduct on July

---

[8] These cases were consolidated on January 3, 2013.

5

31, 2007, the date the Smiths filed a motion with the chancery court expressing their concerns about Pringle's handling of the conservatorship. Alternatively, Harrison County contended that the Complaint failed to state a claim upon which relief could be granted under 42 U.S.C. § 1983. The Conservators contested the motion, stating that the Complaint was timely filed because they did not discover the wrongdoing until after Pringle's death in December 2010.

¶10. McAdams also filed a motion to dismiss pursuant to Rule 12(b)(6), arguing that the Complaint was not timely filed, as all tort claims were barred by the one-year statute of limitations and all Section 1983 claims were barred by the three-year statute of limitations. The Conservators responded, alleging again that the claims were timely filed due to the fact no wrongdoing was discovered until after Pringle's death in December 2010.

¶11. The Conservators filed a motion to sever the Section 1983 claims and bond claims from the Tort Claim Act claims for trial purposes, due to the differences of proof required. McAdams objected to the severance, claiming that the Conservators never alleged any Section 1983 violations against him. McAdams also moved the court to strike the new claims asserted. Harrison County also objected on the grounds that the Conservators had failed to state any Section 1983 claims upon which relief could be granted.

¶12. The trial court denied McAdams's motion to strike, finding that the Conservators "plead a claim in the Complaint by implication against John McAdams in his individual capacity." McAdams filed a motion to reconsider or, alternatively, a motion to dismiss,

urging the court to reconsider its finding that the Conservators properly alleged Section 1983 claims against McAdams.[9]

¶13.    On October 8, 2013, the trial court heard testimony from Julie Smith.[10] Julie testified that on January 24, 2008, (four years and five months before filing the 2012 complaint), she was aware that Pringle had not filed an accounting since being appointed as conservator of Mrs. Pak's estate. Julie testified that "had [Pringle] been forced to produce [bank statements required by the rules] in January of 2008, those bank statements would have made it known that he had stolen money in 2007." Julie also stated that she filed an accounting, prior to Pringle being appointed, without the complete financial information needed from Yong Pak.

¶14.    The circuit court denied Harrison County and McAdams's motions for summary judgment as to the Section 1983 claims and the Tort Claim Act claims. The court sustained their motions to dismiss and/or motions for summary judgment as to the statute of limitations "on the grounds that the statutes of limitations application to Plaintiffs' § 1983 constitutional claims and Mississippi Tort Claims Act expired prior to the filing of the suit and/or the service of the tort claims notice letter." In his bench ruling, the trial judge stated as follows:

> In this case, the basics of the claim is the failure of the defendants requiring or demanding an accounting. And it's clear from the evidence that's presented that as early as, I believe the meeting in 2008, everyone was aware that there had been a failure of accounting, and also, in my opinion, they would have reasonably concluded that an accounting would reveal whether there was or

[9] This ruling was not reconsidered based upon the court's dismissal of the actions.

[10] The complete transcript of this hearing, including the arguments and testimony presented in response to the statute of limitations issue, was not made part of the record. However, attached as an exhibit to the response to the Conservators' motion to reconsider are fifteen pages of Julie Smith's testimony from the October 8, 2013, hearing.

was not an improper use of the funds. That's the purpose of requiring an accounting is to determine if the actions of the one failing to file the accounting is proper.

Of course, the other requirement is that as a result of that failure, the causation is resulting in the loss, and that's clearly without question in my opinion. Obviously, from the testimony presented here today and the evidence produced is that the plaintiffs did not want to file an accounting because it would interfere with their other action they deemed necessary to get an accounting from their father-in-law [sic] and proceed with the divorce to prevent him from obtaining and using Mrs. Pak's funds for his own purpose. This, in my opinion, indicates that they were aware or reasonably should have been aware that there was or could have been a loss from failure to obtain an accounting. In addition to that, we have the further meeting in 2009, the same effect. And it should have been clear, not only to the plaintiffs, but certainly should have been clear to their attorneys that reasonable diligence required that they make or take steps to have the court provide them the information they desired. In my opinion, the statute had, on both claims, had run before the filing of the lawsuit or giving notice of the tort claims act. And I am duty bound to sustain the motions to dismiss on the basis of the statute of limitation.

¶15. The Conservators filed a motion to reconsider, arguing that the statutes of limitation could not run because Mrs. Pak's disability was not removed until a competent conservator was appointed and the continuing violation doctrine did not end until Pringle's death. The circuit court denied the Conservators' motion to reconsider. The Conservators timely appealed.

### ISSUES

¶16. The Conservators raise the following three issues:

I. **WHETHER THE STATUTE ON SOON SAN PAK'S CLAIM RAN WHILE SOON SAN PAK WAS UNDER A DISABILITY?**

II. **BECAUSE THE UNDISPUTED FACTS ESTABLISH AS A MATTER OF LAW THE CONTINUING NATURE OF THE VIOLATIONS AGAINST SOON SAN PAK, DOES THE "CONTINUING VIOLATION" DOCTRINE APPLY?**

8

**III. DO THE UNDISPUTED FACTS ESTABLISH AS A MATTER OF LAW THAT THE SMITH SISTERS KNEW OR WITH THE EXERCISE OF ORIGINAL DILIGENCE SHOULD HAVE KNOWN OF PRINGLE'S EMBEZZLEMENT MORE THAN THREE YEARS BEFORE THEY FILED SUIT WHEN NEITHER THEY NOR THE PUBLIC OFFICIALS RESPONSIBLE FOR OVERSEEING PRINGLE KNEW HE WAS EMBEZZLING FUNDS AND PRINGLE ACTIVELY CONCEALED HIS EMBEZZLEMENT OF FUNDS?**

## ANALYSIS

¶17. This Court utilizes a *de novo* standard of review when considering questions of law and when reviewing a trial court's grant or denial of a motion to dismiss or motion for summary judgment. *Burleson v. Lathem*, 968 So. 2d 930, 932 (Miss. 2007); *McLendon v. State*, 945 So. 2d 372, 382 (Miss. 2006); *Monsanto Co. v. Hall*, 912 So. 2d 134, 136 (Miss. 2005); *Andrus v. Ellis*, 887 So. 2d 175, 179 (Miss. 2004). "When considering a motion to dismiss, the allegations in the complaint must be taken as true and the motion should not be granted unless it appears beyond doubt that the plaintiff will be unable to prove any set of facts in support of his claim." *Burleson*, 968 So. 2d at 932 (quoting *Scaggs v. GPCH-GP, Inc.*, 931 So. 2d 1274, 1275 (Miss. 2006)). *See also Whitaker v. Limeco Corp.*, 32 So. 3d 429, 433-34 (Miss. 2010).

¶18. The Conservators filed both Section 1983 claims, which have a three-year statute of limitations, and Tort Claims Act claims, which have a one-year statute of limitations. Section 15-1-49(2) reads, "[i]n actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury." Additionally,

9

in *Caves v. Yarbrough*, 991 So. 2d 142, 155 (Miss. 2008), this Court held that "the limitations period for MTCA claims does not begin to run until all the elements of a tort exist, and the claimant knows or, in the exercise of reasonable diligence, should know of both the injury and the act or omission which caused it."

¶19.    "The question of whether a statute of limitations is tolled by the discovery rule often turns on the factual determination of 'what the plaintiff knew and when.'" *Stringer v. Trapp*, 30 So. 3d 339, 342 (Miss. 2010) (quoting *Huss v. Gayden*, 991 So. 2d 162, 168 (Miss. 2008)). Thus, "'[o]ccasionally the question of whether the suit is barred by the statute of limitations is a question of fact for the jury; however, as with other putative fact questions, the question may be taken away from the jury if reasonable minds could not differ as to the conclusion.'" *Stringer*, 30 So. 3d at 342 (quoting *Smith v. Sanders*, 485 So. 2d 1051, 1053 (Miss. 1986)).

      I.       **WAS MRS. PAK UNDER A DISABILITY SUCH THAT THE STATUTES OF LIMITATION DID NOT BEGIN TO RUN UNTIL IT WAS REMOVED?**

¶20.    In their motion for reconsideration, the Conservators argued for the first time that the statutes of limitation could not begin to run until a competent conservator was appointed to protect the interests of Mrs. Pak; until such time, Mrs. Pak would be under a disability. The Conservators contend that, since Pringle embezzled from Pak's estate, he was not a competent conservator representing the estate. The Conservators state that a competent conservator was not appointed until Jane Meynardie was appointed interim conservator after Pringle's death. Further, the Conservators argue that the disability was not removed until

10

Benvenutti had been granted permission by the chancery court to file suit on behalf of Mrs. Pak. Therefore, the statutes of limitation were tolled during Pringle's conservatorship and until Benvenutti was granted leave to file this suit.

¶21.    In addition to Pringle being appointed conservator of Pak's estate, the Smiths were appointed as coconservators of Pak's person. The Smiths also retained two attorneys, and the court appointed a guardian *ad litem* to represent the interests of Mrs. Pak in the conservatorship.

¶22.    Section 93-13-27 of the Mississippi Code reads in pertinent part that:

> All suits, complaints, actions and administrative and quasi judicial proceedings for or on behalf of a ward for whom a general guardian has been appointed shall be brought in the name of the general guardian for the use and benefit of such ward, be such general guardian that of his estate or that of his estate and person *or that of his person only.* And all such actions, suits or proceedings shall be commenced only after authority has been granted to such general guardian by proper order or decree of the court or chancellor of the county in this state in which the guardianship proceedings are pending, upon proper sworn petition and supporting oral testimony. . . .

Miss. Code Ann. § 93-13-27 (Rev. 2013) (emphasis added). "Where a guardian or conservator has been court appointed for a ward, there is no logical or equitable reason to prevent the running of the statute of limitations inasmuch as that guardian or conservator is fully authorized to employ attorneys and bring actions on their behalf." ***USF&G Co. v. Conservatorship of Melson***, 809 So. 2d 647, 654 (Miss. 2002) (citing ***McCain v. Memphis Hardwood Flooring Co.***, 725 So. 2d 788 (Miss. 1998)) (statute of limitations is not tolled when a person of unsound mind has a guardian).

11

¶23. Mrs. Pak's disabilities were removed when she was appointed a conservator of her estate, coconservators of her person, and a guardian *ad litem*. The Smiths, through their attorneys, and the guardian *ad litem* had specific authority to request permission from the court to file suit on behalf of Mrs. Pak pursuant to Section 93-13-27. The Conservators' argument that Mrs. Pak's disability remained in effect, tolling the statutes of limitation, until Benvenutti was authorized to file suit on Pak's behalf is without merit. The trial court properly denied the motion for reconsideration on this issue, finding **Melton**, *supra*, to be controlling.

## II. WERE THE CONSERVATORS' CLAIMS BARRED BY THE APPLICABLE STATUTES OF LIMITATION?

¶24. A complaint was filed against Harrison County, Jane Meynardie, Clare Hornsby, and Charliene Roemer on March 23, 2011.[11] A separate complaint was filed on October 3, 2011, against only Harrison County, alleging MTCA claims. Those claims were consolidated and then dismissed for failure to obtain permission from the chancery court. The coconservators then filed two separate complaints on June 29, 2012. If the Conservators knew or should have known of tortious conduct on the part of Harrison County and McAdams, *i.e.*, their failure to require an accounting from Pringle, by the January 24, 2008, hearing, when all parties acknowledged that Pringle had not filed an accounting since his being appointed as conservator, the Conservators' MTCA claims should have been filed by January 24, 2009, and their remaining claims should have been filed by January 24, 2011. As their claims were

---

[11] John McAdams was not named in this suit.

12

not timely filed, the trial court properly dismissed the claims based on the running of the statutes of limitation.

¶25. The Conservators argue that they did not become aware that Pringle was embezzling from Mrs. Pak's estate until after his death in December 2010. However, the record is fraught with testimony that all interested persons were aware, at the very latest, by January 2008 that Pringle had failed to file an accounting. Additionally, the Conservators and their experts testified that, had Pringle been compelled to file an accounting with requisite bank statements, they would have been made aware that he was embezzling from Pak's estate. But the decision not to force Pringle to file an accounting was a strategic one.

¶26. In a sworn affidavit dated November 16, 2012, Julie Smith[12] testified that she "first experienced problems with Pringle in late 2006. Julie asked both "Meynardie and Roemer about getting another conservator early on and on several occasions subsequent to that. Mrs. Meynardie advised against it." She also testified that she "tried several times to have Pringle replaced beginning in or about the fall of 2007 because of his rudeness and unresponsiveness. Jane Meynardie said she was not comfortable with trying to have him replaced and refused to move the Court to replace him. Jane said she did not want to make Woody mad because he would cause trouble for us." She continued to express concerns to Meynardie and Roemer about Pringle's failure to file accountings but was told that "there was nothing to worry about and that they would handle it."

_____

[12] Julie lived with her mother during a majority of the relevant time period and dealt with Pringle's office on a regular basis beginning in 2006, when Pringle was appointed conservator of Mrs. Pak's estate.

¶27.   Additionally, on April 14, 2010, Pringle explained to Julie that he needed to write her a reimbursement check on his trust account instead of her mother's conservatorship account. Julie informed Meynardie, who in turn requested an accounting and bank statements from Pringle. Meynardie sent Pringle another letter, demanding an accounting.

¶28.   Julie testified that, in early June 2010, Pringle finally provided Meynardie with a draft accounting, which showed $277,082.58 in the account, and also finally paid deliquent property taxes on some of Mrs. Pak's property. Meynardie filed a motion addressing Julie's concerns regarding Pringle's handling of the estate. The chancellor ordered Pringle to pay certain expenses and attorney's fees but did not address the issue of Pringle providing an official accounting. Julie testified that she did not know why neither Meynardie nor the chancellor addressed this issue at the hearing.

¶29.   In a subsequent affidavit, dated August 14, 2013, Julie testified that "[f]rom the time that we established the conservatorship until Pringle died, our primary focus was on Yong Pak and trying to recoup monies that he had stolen from my mother. He took upwards of $1 million from her." Julie also testified that she was told by Pringle that he could not file an accounting until he received the requisite financial disclosures from Yong Pak.[13] Julie stated that the January 24, 2008, hearing was primarily to compel Yong Pak to provide the missing financial information."The fact that Pringle had not yet filed an accounting was discussed during this hearing. Based on my conversations with Pringle, I understood that Pringle would file an accounting upon receipt of Mr. Pak's information." Julie again reiterated at that time

---

[13] However, the Smiths were able to file an accounting in 2007 without Yong Pak's information.

"the most important issue was finding out what assets Pak had of my mother's and stopping Pak from dissapation [sic] of my mother's assets."

¶30.     Jackie Smith was deposed on April 3, 2013. Jackie testified that she *probably* knew on January 24, 2008, that Pringle had not filed any accountings. She testified that by January 2009 she knew Pringle had not filed an accounting and "this is when it started to get really agitating and we wanted to really, you know, try to get him to do one."

¶31.     Julie Smith was deposed on April 5, 2013. Julie testified that, at the January 2008 hearing, she was aware that the only accounting that had been filed was the one filed by her sister and herself. She testified that both she and Meynardie were aware in 2007 and 2008 that Pringle had not filed an accounting. Julie stated that she, Jackie, and Meynardie had mentioned to Pringle that they wanted to see an accounting and "he said that he was trying to get all the estate – the property, and the cars, and the subpoenas out, and that he couldn't give an accounting until he knew what was there. So we believed him." She recalled discussing with Meynardie the desire to have Pringle work with them on the divorce to get it completed, instead of pressing for an accounting and risking having Pringle angry with them.

¶32.     Meynardie also was deposed and testified that the chancellor and all attorneys present at the January 2008 hearing knew Pringle had not filed an accounting. Meynardie testified that in, January 2009, she and her clients decided they would not push Pringle to file an accounting at that point. When questioned as to the reasoning behind that decision, she stated that they were "fighting a war with the step daddy. Any time we wanted to do anything, we

15

would have to go into Court, and get an order, and argue with the step daddy over whether it was an appropriate thing to do. And so there certainly were times when I said, this is not the time to go to war with Mr. Pringle because he's being friendly and supportive of our efforts, vis-a-vi [sic] the stepfather, and we don't want to pick that fight today. Let's take care of this and then turn to Mr. Pringle." She further testified that as of January 22, 2009, she was aware that Pringle had not filed an accounting, as he was legally required to do.

¶33. John Dongieux, the coconservators' attorney expert, was deposed and testified that "if Mr. Pringle would have filed an accounting in compliance with the rules and the required bank certificates, his embezzlement would have been discovered." Annette Herrin, the coconservators' accounting expert, testified that one of the reasons Pringle was able to embezzle money from Mrs. Pak's accounts was that no efforts were made to compel him to file an accounting. Herrin stated that if Mr. Pringle had been forced to file an accounting, it would have been uncovered that he was stealing from the estate. "If he would have filed an accounting, a proper accounting, the embezzlement would have been discovered earlier."

¶34. The Conservators' own experts testified that, had the Conservators sought an accounting, the embezzlement would have been discovered. Julie Smith also testified that, if she had received bank statements, which are required to be attached to the accounting, she would have known as early as 2007 that Pringle was embezzling from her mother's accounts. The Conservators and their attorney admitted that they had made a strategic decision to focus on the divorce aspect of the conservatorship and did not want to anger Pringle by having the court compel an accounting.

¶35.     Harrison County and McAdams argued that the Conservators had made a conscious decision not to require Pringle to file an accounting. They asserted that the transcript from the January 24, 2008, hearing revealed that all interested persons were aware that Pringle had never filed an accounting since his appointment as conservator. Based on the 2008 date, the claims were barred by the applicable statute of limitations. Because this issue is dispositive, the remaining issues will not be addressed.

## CONCLUSION

¶36.     The Conservators should have discovered, by reasonable diligence, that Pringle was misappropriating funds from the estate no later than January 24, 2008, when the coconservators – using due diligence – would have received an accounting and bank statements regarding Pak's estate, and would have "by reasonable diligence. . . discovered the injury." Miss. Code Ann. § 15-1-49. The statute of limitations issue is not a question of fact for the jury because reasonable minds could not differ as to when the Conservators knew or should have known of Pringle's failure to file an accounting and, thus, Harrison County's and McAdams's failure in requiring an accounting to be filed. *Stringer*, 30 So. 3d at 342 (quoting *Smith v. Sanders*, 485 So. 2d 1051, 1053 (Miss. 1986)). Based on the record before us, the trial court properly held that the Conservators' claims were barred by the applicable statutes of limitation.

¶37.     **AFFIRMED.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ. CONCUR.**